[No. 2205.]

L. T. Johnson v. The State.

1. Murder—Indictment.—The Statute of this State (Code of Criminal Procedure, Art. 523) enumerates but two grounds upon which an indictment can be set aside, the first being "that it appears from the record of the court that the indictment was not found by at least nine of the grand jurors," and the second being "that some person not authorized by law was present when the grand jury were deliberating upon the accusation against the defendant, or were voting upon the same." Neither of those grounds covers the alleged conditions of this case, wherein the grand jury, voting originally to indict the defendant only for murder of the second degree, indicted him for murder of the first degree upon being advised by the district attorney and the regular district judge (not then presiding) that, under the practice in this State, the offense of murder could be charged only in the first degree; wherefore the motion to set aside the indictment upon the ground indicated was properly overruled.   See the opinion in extenso on the question.

2. Same—Evidence—Predicate.—The State introduced the witness B, who proceeded to testify to statements made the day prior to the homicide by E, at the house of the defendant, with regard to statements

made by the deceased to the said E, as to the deceased's feelings and intentions respecting a previous difficulty with the defendant. It was objected by the defense that the necessary predicate was not established by showing that defendant heard the statements made to B by E. It was shown that the conversation was had at the defendant's house, and, so far as the witness was able to state, in the presence and hearing of the defendant, that the defendant, who was not shown to be deaf, participated in the conversation, and was not out of the room while it was going on Held, that the predicate was sufficiently established, and the trial court did not err in so holding.

3. SAME—IMPEACHING TESTIMONY—PRACTICE.—It is a general rule that a witness can not be cross examined as to any fact which, if admitted, would be collateral and wholly irrelevant to the matters in issue, for the purpose of contradicting him by other evidence. and in this manner discredit his testimony. His answer cannot be contradicted as to the collateral or irrevelant matter by the party who asked the question, but it is conclusive against him. Whether the cross examining party would be entitled to prove it as a part of his own case, tending to establish his plea, is the true test as to whether or not the fact inquired of on cross examination is collateral. See the opinion *in extenso* for a state of case *held* not to come within the purview of the rule; wherefore the trial court did not err in admitting the impeaching testimony.

4. SAME.—For the evident purpose of showing that the deceased had no deadly purpose or intent when he went to the place of the homicide, and that he did not go there for the purpose of executing his prior threats against the defendant, the State, over defendant's objection, was permitted to prove by the mother of the deceased that the deceased, on the night before the homicide, told her he was going on the morrow to organize an entertainment. *Held* error; first, because it was hearsay evidence so far as the defendant was concerned, and, second, because the defendant could not be bound by the undiscovered and undisclosed motives of the deceased when the same were opposed and contradicted by all of the facts and circumstances known to and judged by the defendant from his own standpoint. See the opinion *in extenso* on the question.

SAME—SELF DEFENSE—CHARGE OF THE COURT.—See the statement of the case for a charge of the Court upon the subject of self defence *held* insufficient in view of the evidence in the case.

6. SAME—MANSLAUGHTER.—ADEQUATE CAUSE to reduce a homicide from murder to manslaughter is a fact to be ascertained by the jury from all the facts in evidence, and it is to be esfimated and measured by sudden passion, which may be either of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection. See the opinion and the statement of the case for evidence in a murder trial *held* to] demand of the trial court, a charge upon the law of manslaughter.

APPEAL from the District Court of Hunt. Tried below before the Hon. J. A. B. Putman.

The indictment in this case charged the appellant with the murder of Griff Flippin, in Hunt county, Texas, on the second day of June, 1884. The conviction was for murder of the second degree, the penalty assessed against the appellant being a term of five years in the penitentiary.

Will Green was the first witness for the State. He testified that he lived near Caddo Mills, in Hunt county, Texas. He was acquainted with the defendant, and, in his life time, knew Griff Flippin, who died on June 2, 1884, from the effects of a gun shot wound inflicted by the defendant. Witness and the deceased went to the village of Caddo Mills on the morning of the said June 2, 1884, rode up to a horse rack on the north side of the street, which street was about eighty feet wide, hitched their horses and started towards the drug store on the north side of the street. Just as the deceased and witness left the horse rack the witness looked up and saw the defendant about the middle of the street, going towards his house in a westerly direction. He had already crossed the direct line over which witness and deceased would have to pass to get to the drug store. Defendant walked on some fifteen or twenty feet from the point where he was when witness first saw him, stopped and waited until witness and deceased reached a point nearly opposite to him. He then accosted the deceased and asked: "What about that difficulty Saturday?" Deceased replied: "I have done and said all that I intend to do and say, and that matter is all over with so far as I am concerned." Defendant then drew his pistol and deceased exclaimed: "I am not armed; I did not come here for a difficulty." Defendant replied: "You were fixed on Saturday and I was not. Now I am fixed." Witness stepped forward and asked defendant not to shoot, telling him that deceased was unarmed and had not come to Caddo for a difficulty. Defendant remarked that witness had nothing to do with the difficulty, ordered him to stand aside, presented his pistol at deceased, holding it in both hands and asked deceased: "What do you propose to do about it?" Deceased replied: "Don't shoot. If you are bound to have a difficulty give me a chance." Deceased then threw his left hand to his forehead and pushed up the brim of his hat, and extended his right arm and hand. Defendant at that instant fired at deceased, when deceased turned and ran. He fled into the drug store, followed by the defendant, who fired a second shot after deceased passed in at

the door.   Defendant then ran around the left side of the drug store and witness soon heard a third shot fired.

Deceased was making no demonstrations at the defendant when the latter fired the first or either of the subsequent shots. He was unarmed, having on his person no weapon of any kind other than the common sized pocket knife which was found in his pocket after his death.   Witness went into the drug store as soon as the shooting was over, and helped to undress Flippin for the doctor to examine his wounds.   He found three wounds on his person.   One ball passed through his left arm, and the other two entered the body from behind, one on each side of the back bone.   When he accosted the deceased, and before he fired the first shot, the defendant advanced several steps towards the deceased.

Cross examined, the witness testified that the streets in Caddo run east and west.   Defendant's house stood at the west end of the street, and fronted east.   It was a house of two rooms, divided by a hall, the door of which opened towards the street. It stood about fifty yards from the drug store.   A person in Johnson's house could have seen witness and deceased as they approached town, while they were at the horse rack, and at the time the first shot was fired.   Witness and deceased rode young horses into Caddo in a kind of "jiggling" trot, traveling south until they passed Bass's business house, when they turned south west to the horse rack.   Following the line on which they started from the horse rack to the drug store, the witness and deceased would have crossed the line pursued by the defendant, and passed in his rear some little distance.   Defendant was going south west, and witness and deceased were going north, and not towards the defendant.   An empty wagon stood in front of Elzey's store, which store was east of the drug store. Witness was nearer deceased than to the defendant when the latter turned around.   Deceased was a little ahead and to the right of the witness.   Defendant was to the left of the witness. Witness became somewhat excited when he saw defendant draw the pistol, thinking at the time that he intended to shoot.

Witness was in Caddo on the preceding Saturday.   Flippin was then drinking.   From Caddo witness and deceased went to George Williams's house and passed the night.   They took whisky with them, and played cards all night.   On the next morning (Sunday) deceased and witness went back to Caddo and procured more whisky, and went back.   Grade Smith was with

the deceased and the witness at Williams's house. When witness and deceased reached Caddo on Sunday morning they saw defendant standing in his door, and he saw them. Witness heard Mrs. Flippin, mother of the deceased, tell him before he went to Caddo on that morning, to avoid a difficulty with the defendant, and he heard the deceased reply to her that he would have no further difficulty with the defendant. At this point a large knife was exhibited by the defendant's counsel, who asked the witness if that was the knife the deceased had all day on Saturday, the second day before the killing. Witness replied: "No, nor nothing like it. That is about the size of a knife that Griff (deceased) once owned, but which he traded off some ten days before the killing to Morg. Purdue."

On redirect examination, the State's counsel exhibited a pocket knife, of little more than ordinary size, and asked if that was the knife in the deceased's possession on the Saturday before the killing. Witness identified it as the knife deceased got in exchange for the one he traded to Purdue, and as the same one deceased had at the time of the difficulty on Saturday.

On re-cross examination the witness testified that he and deceased procured their whiskey on Saturday and Sunday at Elzey's drug store, and not at the "Local Option" drug store. They went to Caddo on the fatal day to purchase a pair of boots for the witness, and to organize a dance at Grade Smith's house on that night. Witness and deceased left Caddo together on Sunday. Witness did not, on that or any other day, hear deceased make any threats of violence against or apply any violent language to the defendant.

Dr. C. W. Bowman was next introduced by the State. He described the wounds on the body of the deceased and pronounced the two through the back as necessarily fatal.

Will Gary testified, for the State, that he now lived in Fannin county, but at the time of the killing lived at Caddo Mills, in Hunt county. Witness saw the difficulty, in part, which resulted in Flippin's death. From where he was standing, on Williams & Bro.'s store, he saw deceased and Will Green ride up to the horse rack on the south side of the street. At the same time he saw defendant standing on the gallery in front of Elzey's store. Johnson walked from that point to the rear of a wagon standing in front of the store, changed a pistol from his pants waist to his left pants pocket. He then started west. About that time deceased and Green started from the horse rack towards Bain's

drug store, and just as they started the deceased threw his hand behind him, and then dropped it to his side. The rack stood about ninety feet south and a little east of Bain's drug store, and about on a line due south of an alley running between the drug stores of Elzey and Bain. Witness was on a line due west of where defendant was when he first saw him. The wagon stood south of the alley between the two drug stores. When deceased and Green started towards Bain's store, defendant walked to a point fifteen or twenty feet west of a line marking the route being traveled by Green and deceased. When deceased reached a point nearly opposite defendant, the defendant said something witness could not understand. He failed also to understand the deceased's reply. Defendant then pulled his pistol, raised it in both hands, and witness fled into the store. While he was in the store the first two shots were fired. Witness then ran out of the store and saw defendant run to the corner of the drug store, point his pistol towards the rear of the store and fire. Witness could not see the deceased at that time. Deceased did not put his hand about his pocket at any time during the conversation with defendant.

Cross examined, the witness testified that the defendant's residence was at the west end of the street. The house in which witness was standing was east of defendant's residence and thirty-five feet west of the drug store. When deceased and Green reached town, defendant was leaning either against the door of Elzey's drug store or against a post at the edge of the gallery. Witness did not see Green and deceased when they dismounted. He was then looking at defendant, and did not observe deceased again until defendant stepped off the gallery to the wagon and arranged his pistol and started in a westerly direction. At that particular moment he saw deceased and Green leave the rack, and it was then that deceased made a motion towards his coat tail with his hand, and then dropped it to his side. Had defendant gone on, the deceased would have passed in his rear, but how far, the witness was not able to say. Defendant did not advance on the deceased until he drew his pistol. Deceased did not advance upon the defendant. Leaving the wagon, defendant walked west, and the deceased went north from the horse rack. The latter would have had to walk at least seventy-five feet before crossing the line traversed by defendant. Late on Saturday evening, the second day before the killing, and after he had had a difficulty with defendant, the deceased came to witness and asked if he

had a pistol. He did not tell witness what he wanted with the pistol. Witness had no such weapon, and so informed the deceased. Johnson, the defendant, was the first of the two parties involved in the tragedy, to speak on Monday, just before the killing.

Dick Lewis testified, for the State, that he was in Doctor Bain's drug store, purchasing medicine, when the shooting took place. While facing Doctor Bain across the counter, witness heard some loud talking out in the street in front of the drug store. Looking around he saw William Green and the deceased, the latter with both hands extended. Witness then walked to the door, and saw defendant confronting the deceased, with a pistol leveled in both hands. Deceased said to defendant: "I thought that matter was settled on Saturday. I have not come here for a difficulty." Defendant asked in reply: "What are you going to do about it?" still holding the pistol presented. Deceased replied: "I am unarmed. If you are bound to have a difficulty, give me a chance." Defendant replied: "You were fixed on Saturday, and I was not. Now I am fixed." Defendant then raised his pistol as if to shoot, and witness turned back into the store. A pistol fired, and deceased ran into Bain's store and towards the rear. Witness looked towards the door, and, when deceased got about opposite him, he heard another shot, and saw defendant standing in the door, his pistol extended and smoking. Deceased ran on out at the back door, hallooing, and fell at the back door. Another shot was fired, and deceased scrambled back into the store and fell again. Witness helped place him on the counter and undress him.

Doctor W. S. Bain testified, for the State, substantially as did Lewis, except that he could not distinguish what was said by defendant or deceased, and could not see the deceased or Green at the time the first shot was fired. The witness described the wounds on the body of the deceased as they were described by previous witnesses, and stated that he dressed the body of the deceased, finding no weapons on his person. The State closed.

G. W. Boles was the first witness for the defense. He testified that on the Saturday before the fatal Monday he saw deceased at the Canady store, and at Mr. Saylor's shop in Caddo Mills. In Canady's store the deceased said that he had been down to the mills to get some meal with which to pay a debt to old man Angle, and that defendant would not let him have it, and that if defendant fooled with him he would cut his G—d d—d heart

out. Later, at Saylor's shop, he repeated the statement in substance, whetted his knife, and said he was going back to the mill then. Witness saw defendant later in the evening and told him that deceased had made the threats stated, and was a dangerous man, and advised him to watch him. The knife exhibited as the knife taken from deceased's person after death resembled the knife whetted by deceased at Saylor's shop, and was either the same knife or its counterpart. It would measure five inches in the blade, and was a very heavy knife. Deceased was a man who might reasonably be expected to execute a threat.

On his cross examination the witness repeated in substance his testimony in chief, and added that, on his way to the mills later on Saturday evening, he met Morg. Purdue running away from there, and was told by him that a fight was about to occur in the mill. Witness proposed to go back and stop the fight. Morg.'s simple comment was: "Stop hell!" as he continued in flight. Witness had known deceased for five or six years and had always regarded him as a dangerous man. Deceased's mother once told the witness that she expected the deceased to be killed at last. Witness and deceased had been the best of friends, though they had one quarrel. That quarrel, however, was settled long before the killing.

Cross examined, the witness testified that the conversation with Mrs. Flippin occurred in the presence of Charley Boles at his house. Charley Boles and deceased were brothers in law. Witness never knew of the deceased having any serious trouble with any person other than Johnson. On the occasion of the settlement of the difficulty between witness and deceased witness told Mrs. Flippin that if deceased renewed the quarrel or provoked other trouble with him he would kill him. He did this because he was afraid of deceased. It was then that Mrs. Flippin said that she expected deceased to be killed at some time. Some of witness's neighbors believed him, witness, to be afraid to leave home at night, and some of his neighbors believed him to be a fool.

Frank Canady testified, for the defense, that on Saturday evening preceding the killing the deceased came to him in his store in Caddo, took him to one side and asked if witness could lend him a little money. Witness asked him how much he wanted. He replied that he wanted three or four dollars, with which to buy meal to pay a debt to Mr. Angle. Witness told

him that he did not have that amount convenient at that time. He said that defendant refused to let him have the meal without the money. Deceased then grew excited and said that he would go back and see defendant and tell him what he thought of him. Witness tried to dissuade him from going; Deceased replied: "Yes, I'll go, and if he crosses me I'll cut his d—d heart out." Witness thought that deceased was then under the influence of whisky, though he appeared cool and deliberate. Witness told deceased that defendant had a right to refuse him credit and pleaded with deceased not to go back to the mill. Deceased replied: "Yes, I will go back and raise h–ll." Deceased was considered a brave, but not a violent and dangerous man. He was reasonably calculated to execute a threat, and was afraid of no man. The knife exhibited by defendant's counsel looked like a knife which deceased procured from the stock of witness a few days before the killing. Defendant's right hand was so crippled that he could not use his fingers.

Henry Alexander testified, for the defense, that he saw deceased on the Saturday before the killing, at Johnson's mill. He afterwards met him at Saylor's shop, when he asked witness to lend him some money to buy meal with which to pay a debt he owed Mr. Angle. He said that Johnson refused to sell him the meal on credit, and that he was going back to see Johnson, and if Johnson again refused him credit he would kill "the d—d son of a b—h." Holding his knife against the witness's breast he showed witness how he intended to cut Johnson's heart out. Witness replied that if Johnson had any grit he would hurt him. Deceased replied that he was too great a coward, and had already taken much from him. The witness thought deceased was drinking but not drunk. Witness had frequently lent deceased a dollar or two at a time, and deceased always paid him back. The knife in evidence was the one deceased had, or one very much like it.

E. A. Andrews testified, for the defense, that, on the Saturday before the killing he passed the deceased and another man at a branch near Caddo, and heard the deceased say that he was going to kill Mr. Johnson. After a little time deceased and the other party passed the witness in a lope, the deceased calling out to witness: "Get out of my way, or I will run over you, G–d d—n you." Witness went on to the mill and saw deceased and defendant close together at the engine. Deceased had a knife in his hand with the blade held towards defendant. Witness

could not hear what passed between defendant and deceased at the mill. Deceased presently left the mill and went on to town. The other man stopped before getting to the mill.

Clay Shepherd testified, for the defense, that on the Saturday previous to the killing, and after the first difficulty between defendant and deceased, he met the deceased going to Johnson's mill. Deceased said: "By G—d, I am going back there." Witness replied to him: "Griff, let that man alone." Deceased replied: "By G—d, I am going to cut h—l out of him." Witness told him that he would get himself into trouble. Deceased replied: "I can get out of it. No man can run over me, if I am little." Several parties then came up, and, with witness, followed deceased to the mill. Reaching the mill door, deceased pulled a large knife, yelled and went in at the door. When witness next got sight of deceased, he and Johnson were confronting each other in the engine room, deceased with the knife in his hand, and defendant working at something with a monkey wrench. Deceased flourished the knife in front of defendant and said something which witness could not understand. Johnson told deceased to leave, as he did not want a difficulty with him. Presently Johnson went to a wagon standing in front of the mill to see about some rails, and started back, encountering the deceased. The deceased, still holding the knife in his hand, proceeded to curse Johnson, who again appealed to him to leave and not molest him in the discharge of his business. Deceased stepped aside and defendant went into the mill with a rail which he threw down near the engine and proceeded to cut. Deceased stepped in front of defendant and said: "Johnson, you are a G—d d—n stinking son of a b—h! Everything you have got you stole from your neighbors." Defendant said: "I can't stand that," and struck at deceased with the axe. Deceased dodged the blow. Will Green and Grade Smith took the deceased away from the mill, and they went up town.

Witness soon went up town and saw Johnson standing in the front door of his residence, and deceased standing in the door of Williams's store, in plain view of Johnson and not more than twenty yards distant. Deceased was talking to Mr. Pile. Witness heard Pile say to deceased: "Yonder stands Johnson now. You are too little to be talking that way. The first thing you know Johnson will come over and thrash you." Deceased replied: "I am not going back to raise another row with him, but if he ever sets foot in this town again when I am here you

will see what becomes of him." Neither Grade Smith nor Will Green attempted to interfere or prevent a collision at the mill until defendant struck at deceased with the axe. Mr. Jarrell was at the mill at the time of the difficulty.

Cross examined, the witness testified that when Johnson returned from the wagon with the rail, and found deceased standing in the mill door and said to him that he did not want a difficulty, and did not want to be disturbed in his business, deceased stepped aside and said: "There is room enough here for both of us." When Johnson threw the rail down and proceeded to cut it, deceased stepped in front of him and said: "Mr. Johnson, I came here to tell you what I think of you, and I am going to do it. You are a G—d d—d thieving son of a b—h, and all you have you stole from your neighbors." At the same time he brandished the knife in Johnson's face, and Johnson struck at him with the axe. Green and Smith then took the deceased off.

M. Jarrell, the next witness for the defense, testified to the occurrence in the mill, at the time that deceased confronted defendant over the rail at the engine, substantially as did the last witness. When deceased got outside of the mill, escorted by Smith and Green, he said to witness, who had followed, that he had never backed or run from a man in his life. Witness jokingly replied: "You rattled your hocks just now." Deceased, striking his open knife against the door twice or thrice, replied: "If I ever catch Johnson in town or outside of his mill, or away from his engine, I will cut his G—d d—d heart out." At that time Johnson was inside of his mill. Witness saw deceased at Grade Smith's on the next day. He was "sorter charging around with the boys," but said nothing about Johnson that witness heard.

Jesse Pete testified, for the defense, that he met deceased at Williams's store, opposite Johnson's residence, on Saturday, just after the row at the mill. Johnson's residence was not more than fifty or sixty feet distant. Deceased cursed and abused Johnson. Witness replied that he should not talk so boastingly; that Johnson had just entered his house, would hear him, and come out and thrash him. Deceased replied that, if defendant ever made a track in town while he was there, that witness would see what would become of him, defendant. Witness thought that Johnson could have heard deceased. Witness considered deceased a wild boy, but not a dangerous man.

James Boyle testified, for the defense, that he saw deceased on

Saturday evening, and asked him if, having failed in his promise to do some work for him on that day, he could do it on Monday. Deceased replied that he could not; that he had got into trouble and would have to ride out of it.

Henry Oxford testified, for the defense, that deceased and Will Green passed him on the road on Sunday morning, the day before the killing. Deceased said to Green: "I'll be d—d if I don't kill him before Monday night." Later in the day, defendant told witness of his trouble with deceased on the day before, and witness told him what he heard deceased say.

Ben Williams testified, for the defense, that defendant was in his store in Caddo on Sunday morning, the day before the killing. Something was said about his difficulty with the deceased on the day before, and witness told defendant that Bill Boss had requested him, witness, to tell defendant that deceased had been going around on Saturday evening trying to borrow a pistol with which to kill defendant.

J. C. Saylor testified, for the defense, that deceased applied to him for the loan of three or four dollars on Saturday evening, complaining that Johnson had refused to credit him for meal. Witness told deceased that he did not have the amount asked, but would lend him what he had—one and a quarter dollars. Deceased said, excitedly, that he was going back to the mill, and, if defendant fooled with him, he would cut his d—d heart out. Deceased was a man reasonably calculated to execute a threat.

J. W. Bole, who was present at Saylor's shop, corroborated Saylor's testimony, and added that, while there, deceased sharpened such a knife as that exhibited by the defendant's counsel.

Seaborn Cooper, the next witness for the defense, testified that he saw the fatal rencounter between deceased and fedendant from a point opposite Williams's store. He detailed the particulars of the meeting and shooting substantially as did the witnesses for the State, except that he heard nothing said by the parties, and that, when deceased, just before the first shot was fired, threw his right hand to his head, he threw his left hand to his pocket. Witness was present when the deceased was undressed. His coat was laid on a shelf behind the counter, near the position occupied by Will Green. Green left before other parties present did, and witness observed that he had something bulky in his pants' pocket. He held one hand on his pocket, apparently trying to conceal the bulk.

Mrs. Jennie Johnson, wife of defendant, testified, for the defense, that she witnessed the fatal encounter from the front door of her husband's residence. Her daughter informed her that she had seen deceased and Will Green ride into town, and she thereupon went to the front door. She saw her husband coming towards home. Deceased and Green followed as far as the horse rack and dismounted, and then came on on foot. Mr. Johnson, after walking some distance, turned and faced them. Witness could not understand what was said by any of the parties. Presently deceased pushed the front of his hat up with his right hand and threw his left hand to his pocket, and Mr. Johnson fired. When witness first saw the deceased and Green they were following defendant. Defendant did not advance upon deceased before firing the first shot. Miss Mattie Johnson corroborated the testimony of her mother.

George Williams testified, for the defense, that deceased, Grade Smith and Will Green came to his house on Saturday night before the killing, bringing three bottles of whisky. Deceased told witness about his trouble with Johnson and said that he would kill Johnson before Monday night. Witness replied that he would like to see the trouble settled. Deceased replied that all he regretted was that he did not cut Johnson's guts out on Saturday. On Sunday morning deceased and Green went to Caddo and soon returned with two more bottles of whisky. Grade Smith and Will Green could have heard deceased's statement to witness about Johnson and his Saturday difficulty.

A number of witnesses testified to the bad reputation of the deceased as a dangerous, violent and overbearing character, and to the fact that he was often seen wearing a pistol. Other witnesses testified to defendant's reputation as a quiet, peaceable citizen, and the defense closed.

Grade Smith, testifying for the State, in rebuttal, said that he was at Johnson's mill at the time of the row, on Saturday. Hearing Johnson and deceased talking roughly at the engine, witness went up to them and advised them to have no row. Deceased began to tell witness about the difficulty, and then Johnson began to tell it. Deceased told Johnson to hush, as he was telling it. Johnson then went and returned with a rail, and told deceased to leave, as he wanted to fire the furnace. Deceased said: "There is the furnace, put it in." He then added: "I came in only to tell you what I thought of you, and I have done so." Johnson ran at and struck at deceased

with his axe. Deceased dodged and fell, and witness and Green took him out. While mad and cursing outside, the deceased struck the mill door a time or two with his fist. Witness and Green went with deceased to George Williams's house and remained over night. Deceased did not, while at Williams's, make the statements imputed to him by Williams. If he had done so, witness would have heard him. Deceased never, at any time or place, in the hearing of witness, uttered a threat against Johnson. He was a "wild and somewhat rattling" boy, but not a dangerous, violent or quarrelsome one. He had a pocket knife in his hand, while at Johnson's furnace, on Saturday, but made no demonstration with it. He was whittling a stick. The knife he then had was not the large knife exhibited by the defense, but a smaller one. Deceased was drinking on Saturday. Witness could not say that deceased was or was not calculated to execute a threat made while drunk, but he himself would pay no attention to a threat uttered by deceased when under the influence of whisky.

M. L. Angle, testifying for the State, in rebuttal, detailed the particulars of the fatal rencounter as he witnessed it from Bain's drug store, substantially as did the State's witness, Dick Lewis. On his cross examination the witness stated that on the Saturday prior to the killing, deceased, who was to pay him in meal for ten bushels of corn, paid him a dollar and a quarter and told him to spend that much for meal, that he had tried to buy meal from Johnson on credit, and failed. He adding that he was going back to the mill to see the d—n son of a b—h.

Thomas Brumley testified, for the State, that he and the defendant and Dallas Elzey were in a room of the defendant's residence together, on the Sunday evening before the killing. The conversation was carried on in an ordinary tone. Elzey spoke of the difficulty between defendant and deceased, and said that he saw deceased on Saturday evening, and told him that he was in the wrong, and that deceased replied that maybe he was and would drop the quarrel. Witness did not know whether Elzey was talking to him or defendant, but defendant replied: "I am afraid I am in bad hands." Witness could not describe the defendant's position at the time the remark was made, nor would he swear that he was in the room, though he was satisfied in his own mind that he was. Defendant went to his door once and called Henry Kluge, and once went to his window, but did not leave the room, so far as the witness knew.

Jake Kennedy testified, for the State, that he witnessed the fatal difficulty from Williams's store, his attention being attracted to the parties by Johnson's first speaking to Green and deceased as he confronted them. From this point the witness's statement was substantially the same as that of Will Green.

Mrs. Flippin, the mother of the deceased, testified, for the State, that when deceased left her house on Sunday evening before the fatal Monday he said that he was going to get up a party at Grade Smith's. Witness denied that she ever told the defendant's witness, Boles, that she believed her son Griff would be killed some time. Boles never told her that he would kill Griff if he ever got into a difficulty with him. There was no pistol kept about the witness's house. Deceased owned a knife like that exhibited by the State's counsel. Witness met deceased and Will Green on their way to Caddo on Monday morning, but said nothing to them about not getting into a row with Johnson.

Morgan Purdue testified, for the State, that a few days before the killing he traded the deceased such a knife as that exhibited by the State's counsel, for such a knife as that exhibited by the defendant's counsel. Witness used the latter until he broke it. Witness was at the mill on Saturday about the time of the row between the deceased and the defendant, but saw no more of the fuss than the blow aimed at deceased by defendant. He met Boles as he was leaving the mill and told him a fight between deceased and defendant was about to occur. Boles proposed to go back, and witness declined. Deceased was a little wild, but was not a dangerous, violent man.

Several witnesses were introduced by the State who testified that they were acquainted with the reputation of the deceased for peace and quietude, and that it was good.

Dallas Elzey testifying for the defense, in rebuttal, denied that he saw deceased on Saturday evening, or that deceased ever told him that he was going to drop the difficulty with defendant, or that he ever made to Johnson, or Brumley, or Smith, or Hooten, or Stinson, or anybody else, at any time or place, the statement imputed to him by Brumley.

Testifying for the State in sur-rebuttal, the witnesses, R. D. Hooten, Grade Smith and Sam D. Stinson, said that, on the day before the defendant's examining trial, Dallas Elzey, in his saloon in Caddo Mills, and in their hearing, said that he saw the deceased on Saturday evening before the killing; that the deceased then said he was willing to drop the difficulty, and that

he, Elzey, told Johnson on the next evening that deceased had so said.

J. L. Greenwood, M. T. Buchanan, J. B. Smith and W. C. Smith, testifying for the defense in sur-rebuttal, stated that they were familiar with Dallas Elzey's reputation for truth and veracity, and that it was good.

The charge of the court, referred to in the fifth head note of this report, reads as follows: "Homicide is permitted in the necessary defense of the person, when inflicted for the purpose of preventing the offense of murder, or when inflicted for the protection of the person against any unlawful and violent attack which produces in the person a reasonable expectation or fear of death, or some serious bodily injury; and in either case, the party whose person is attacked is not bound to retreat in order to avoid the necessity of killing his assailant. Where, however, the attack made, though it be unlawful and of a violent character, yet is not such as to produce a reasonable fear or expectation of death or of serious bodily harm, then the party assailed must resort to all other means except retreat for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack; otherwise the homicide will not be justifiable."

The motion for new trial raised the questions discussed in the opinion.

*Terhune & Yoakum, Perkins, Gilbert & Perkins* and *Upthegrove & Hefner,* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. The indictment in this case was for murder of the first degree. A motion was made by defendant to abate or set it aside because it was not the voluntary act of the grand jury, in this, that the said grand jury, after investigating the facts, unanimously agreed that the indictment should be for murder of the second degree, and so reported it to the district attorney; that the district attorney refused or declined to draw it for that degree, and told them that it could only be drawn for murder of the first degree. It appears that the regular judge of the court had been taken sick the first week of the court, and was confined to his bed at a hotel—a

special judge having been elected in his stead to preside. Not being satisfied about their duty in the premises, the foreman of the grand jury went to the hotel to consult with the sick judge about the character of the indictment, and the said judge also told him that an indictment could not be drawn for murder of the second degree, and that it must consequently be returned for murder of the first degree; and it was under these circumstances so returned, contrary to the wishes and finding of the grand jury. Upon the hearing of the motion to set aside, the same was overruled by the court.

Our statute provides but two grounds or causes for setting aside an indictment, and expressly declares that it shall be set aside for no other. These are, 1. "That it appears by the records of the court that the indictment was not found by at least nine grand jurors;" and, 2. "That some person not authorized by law was present when the grand jury were deliberating upon the accusation against the defendant, or were voting upon the same." (Code Crim. Proc., Art. 523.) Under the facts shown, the case here stated comes within neither of the causes specified. There is no question as to the number of jurors who returned the bill, and it is evident that the district judge, though advising at his hotel, was not present when they were deliberating and voting upon the accusation against defendant. A plea in abatement or to set aside does not lie to establish by the evidence of individual members of the grand jury that the bill of indictment was never found. (State v. Oxford, 30 Texas, 428.) There is no authority to inquire whether an indictment was based on sufficient proof. (Morrison v. The State, 41 Texas, 516; Terry v. The State, 15 Texas Ct. App., 66.) A defendant has no right to inquire into the intentions of a grand jury except as they are expressed in the indictment. (Cotton v. The State, 43 Texas, 169.)

Independent of the two statutory causes named, jeopardy and want of jurisdiction are inherent defenses derived from the Constitution, and are recognized as the only exceptions to the statutory rule. (Rainey v. The State, 19 Texas Ct. App., 479; Williams v. The State, 20 Texas Ct. Ap., 357.) The court did not err in overruling the motion.

Several exceptions assail the ruling of the court in admitting the testimony of one Brumley as to statements made the day before the killing, by one Elzey, at the house of defendant, with regard to statements made by deceased to Elzey as to deceased's

feelings and intentions respecting a previous difficulty with defendant. It is claimed that a sufficient predicate was not laid for the admission of this evidence, in that it is not made sufficiently to appear that defendant heard the statements made to Brumley by Elzey. We are of opinion a sufficient predicate was laid, and that the evidence was admissible. The conversation was at defendant's house, and, so far as the witness was able to state, both in the presence and hearing of defendant. Defendant was not shown to be deaf, was not out of the room where the conversation was going on, participated in the conversation, and, being the party most deeply interested, it is scarcely reasonable or even probable that he would not pay strict attention to a matter so nearly affecting his welfare—the statements by his most deadly enemy to his friend as to the purpose and intention of his enemy to further prosecute the difficulty, as he had threatened he would do.

Elzey, when placed upon the witness stand by defendant, on his direct examination, denied that he had ever made the statements attributed to him by Brumley at Johnson's house, and denied on cross examination by the State (the times, places and circumstances as a predicate having been fully laid), that he had ever made similar statements as to deceased's declarations of intention, and the fact that he had informed defendant of the same to three other named parties. Subsequently, when the three parties involved in the predicate were introduced by the State to impeach Elzey in this particular, the defendant objected that the evidence was inadmissible, in as much as the proposed subject matter was wholly collateral, and it having been elicited on the cross examination by the State of the witness Elzey, the witness's answer was conclusive, and the State was estopped from prosecuting a further inquiry into its truthfulness.

It is a general rule that a witness can not be cross examined as to any fact which, if admitted, would be collateral and wholly irrelevant to the matters in issue, for the purpose of contradicting him by other evidence, and in this manner discredit his testimony. * * * His answer can not be contradicted as to the collateral or irrelevant matter by the party who asked the question, but it is conclusive against him. (1 Greenlf. Evid., 13 ed., 449, and notes; Britt v. The State, 10 Texas Ct. App., 368; Stevens v. The State, 7 Texas Ct. App., 39.) The test as to whether a fact inquired of on cross examination is collateral, is this: Would the cross examining party be entitled to prove it as part

of his own case, tending to establish his plea.   (Hart v. The State, 15 Texas Ct. App., 202, citing Whart. Crim. Evid., 8 ed., sec. 484.)   Now the State, as part of its case, would undoubtedly have had the right to prove that, on the day before the killing, the defendant had been informed that deceased had declared his intention to drop the difficulty.   Whether he had been so informed was a material issue in the case, and upon this question we can perceive no error in admitting the testimony impeaching the witness Elzey.

Defendant's fourth bill of exceptions is to the action of the court in permitting the State's witness, Mrs. Flippin, mother of deceased, to testify, over objection of defendant, that on the night before the killing her son told her "that he was going on the next day to make up a party at Grade Smith's on Monday night."   Obviously the purpose of this testimony was to show that deceased was entertaining no deadly purpose or intent when he went to Caddo Mills, the place of the homicide, and that he did not go there to carry out the threats he had previously made against defendant's life.   We are of opinion the evidence was inadmissible, it being hearsay so far as defendant was concerned, and as such it was not binding upon him.   An analogous question was raised in Brumley v. The State, decided at the last Austin term, and it was held that the evidence was inadmissible.   It is true, in fact, that in no sense it could be said that the motives of Flippin in going to Caddo Mills on the fatal morning were a material issue in the case, and whatever his motives, they could not be binding upon defendant unless he was apprised of them, and he should not be held bound by any such secret, unexpressed and hidden motives when the same are directly at war with all the facts and circumstance as known to and judged of by him from his own standpoint.   It is a maxim of the law that a man is only bound so far as matters reasonably appear to him; he can not be bound by motives locked up and hidden in the breasts of others.   Deceased's undisclosed and undiscovered motive in going to Caddo Mills was not a material issue, and could throw no light whatever upon the guilt or innocence of defendant, whose motives alone were the important issue to be tried.

We are aware there is a conflict of authority upon the question, and the doctrine as declared in Hunter v. The State (11 Vr. N. J.), reported in volume 1, Criminal Law Magazine, page 64, is perhaps in direct opposition to our views, as expressed in the

Brumley case. Still, a more mature consideration has only confirmed us in the correctness of our position as to the inadmissibility of such testimony. A defendant at the time he acted was entirely ignorant of all knowledge of it, and yet the jury which tries him, knowing the facts, holds him responsible for their existence as facts. To do so is not justice, and, not being justice, it can not be law. It was error to admit the evidence.

Other objections to evidence saved by bills of exception are not commented upon, because not considered material. General and special exceptions were reserved to the charge of the court, and ten special instructions requested for defendant were refused by the court, and exceptions saved. We have neither the time nor inclination to notice these exceptions seriatim. Suffice it to say, that upon murder of both degrees and the law of self defense, whilst the charge presented the law, we do not think it presented self defense as applicable to the facts so pertinently, and certainly not with the same affirmative force in favor of defendant, as it was announced in more than one of the refused instructions, which should have been given.

There was no instruction upon manslaughter, and that phase of the law was not submitted. We are of opinion the facts warranted and called for a charge upon manslaughter. It was for the jury to say from the facts whether or not adequate cause existed for the homicide. Adequate cause is estimated and measured by sudden passion, and this sudden passion may be either of the emotions of the mind known as anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection. (Penal Code, Art. 594; Williams v. The State, 15 Texas Ct. App., 617; Hobbs v. The State, 16 Texas Ct. App., 517.)

Two days before the killing appellant had had a most serious rencounter with deceased, in which deceased had assailed him with a knife—a deadly weapon. Deceased left him on that occasion breathing out threatenings and slaughter against him. He renews the threats subsequently, even in more violent language, to several parties in Caddo Mills, saying he intended to kill defendant before Monday night. Defendant's friends, hearing of these threats, warn him of his danger; tell him deceased is a dangerous man, one likely to execute his threats—and the evidence strongly tends to establish such a character. Defendant is a man of peace, but in view of these facts arms himself with a pistol. On Monday morning he is in the village close to his home attending to his business, when he sees his deadly en-

emy arrive upon horse back, dismount, throw his hand behind him as though to his hip pocket. Defendant starts for his horse, deceased approaches as though to intercept him, he comes within a few feet. Will any one say that under these circumstances defendant's mind could not be, and probably was not, aroused to sudden new *terror or resentment*, rendering it incapable of cool reflection? If it was, then there was adequate cause in law.

It is true the statute says that "the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation." (Penal Code, Art. 594.) But we have here, not only a former provocation, but the present new terror or resentment, aroused by the acts and conduct of deceased, and we may look to the former provocation in estimating and determining the reasonableness of and the degree of the present terror or resentment; that is, as to whether it probably affected the mind to the extent that it was incapable of cool reflection. As was said in Miles v. The State, 18 Texas Court of Appeals, 170: "Now, while it is true that the provocation must arise at the time of the commission of the offense, and the passion must not be the result of a former provocation, yet, in passing upon the sufficiency of the provocation, and on the effects of the passion upon the mind of the defendant, the past conduct of the deceased towards defendant, his threats and bearing, in fact, all the facts and circumstances of the case, should be considered by the jury. An act standing alone may not be sufficient provocation, but may be ample when it is one of a series of similar acts, or when it has been preceded by an insolent and aggravating course of conduct, whether similar or not to the act committed at the time of the homicide." (Rutherford v. The State, 15 Texas Ct. App., 236; Williams v. The State, 15 Texas Ct. App., 617; Neyland v. The State, 13 Texas Ct. App., 537; Wadlington v. The State, 19 Texas Ct. App., 266.)

For errors pointed out as to evidence, and for failure and omission of the court to instruct the jury with regard to the law of manslaughter as applicable to the facts of the case, the judgment is reversed and the cause remanded.

*Reversed and remanded.*