### J. T. WILSON v. THE STATE.

*No. 1182.   Decided January 21st, 1897.*

**1.  Murder—Evidence.**

On a trial for murder, where the theory of the defense was, that the defendant went to deceased's saloon only for the purpose of getting his son, a minor, away from the saloon, where he was opposed to his being and where the deceased was keeping him to his ruin. Held: It was admissible to prove that defendant himself formerly owned and run the saloon, during which time, the son was permitted to frequent said saloon for years and defendant was never heard to object.

**2.  Same—Impeachment of a Witness as to His Opinion Evidence.**

On a trial for murder, the fact that a witness had been with defendant that evening, that he had talked with him an hour, and that he knew that the difficulty was going to come off, and that there was going to be trouble, and that he left to keep from seeing it, was illegal and inadmissible upon the ground that it was merely opinion evidence, and being opinion evidence and inadmissible it could not be used as a basis for the impeachment of the witness. Following, Drake v. State, 29 Tex. Crim. App., 265.

**3.  Same—Evidence of Threats by Third Parties.**

On a trial for murder, evidence that a witness was informed by another witness that he had heard defendant's son say to other boys, "that they would wait until some dark night and waylay the old man and do him up," was inadmissible, the circumstances showing that the difficulty was not brought about in any such a way.

APPEAL from the District Court of Erath.   Tried below before Hon. J. S. STRAUGHAN.

Appeal from a conviction for murder in the second degree; penalty, ten years' imprisonment in the penitentiary.

Appellant was charged, by the indictment, with the murder of Wm. Kay, in Erath County, on the 15th day of December, 1895, by stabbing and cutting him with a knife.

The killing occurred on Sunday evening, about or just after dark. Deceased Kay was a saloon keeper, and his partner in the business was Jake Wilson, a brother of defendant. It appears, that several years before defendant had sold out this saloon to these parties, after he had been running it several years himself. Defendant, it seems, had never been satisfied with the sale he had made to them, and he had frequently said they had robbed him. Defendant had an only child, a minor, who, it seems, was an intimate friend of deceased; spent most of his time at the saloon and slept there at night with deceased. Defendant had tried to break up this association and he and the son had had many fusses about it. On the Sunday evening of the killing, defendant found his son somewhere in the neighborhood of the saloon, and, upon his refusal to

go home quietly, took him by the collar, and was taking him along by force. The boy was smoking a cigarette, and, in striking the cigarette from his hand, defendant loosened his hold upon his collar, and the boy ran and the father pursued him. A crowd of men and boys were laughing and jeering at the father, which added greatly to his rage. The boy, after dodging his father for some time, finally got into the meat market, and, though it is not stated, presumably he secured the door so his father could not get in. Defendant commenced walking up and down the street in front of the meat market, in a terrible rage, cursing and abusing the parties who were keeping his son about the saloon, ruining him and dragging him down to hell; and he was seen to pull out his knife, open it and put it open into his pocket. While he was thus engaged, the deceased, who had just returned from a buggy ride and gone into his saloon by the back door, emerged from the front door, and walked to the door of the meat market, and placing his foot upon the door-sill, seemed to watch the movements of the defendant. Defendant repeated what he had been saying, to the effect, that the parties had robbed him and were now keeping his boy at the saloon and ruining him. When deceased said, that was a lie. Defendant asked him what he had said, and deceased replied, "that was a g—d d—d lie!" Defendant replied, he was another and the parties immediately rushed at each other: deceased being the younger and more powerful man. Deceased struck defendant with his fist, and defendant at the same time struck him. They fell—deceased on top. In a short time, deceased sprang up, held to a post with one hand and stamped defendant in the face with his heels, until the lookers-on pulled him off. Deceased was stabbed in the heart and in one or two other places, and died in a few moments. Defendant was picked up and carried off in an insensible condition, and was badly bruised up.

It will be seen from the opinion, that the judgment of the court below is reversed on account of illegal testimony permitted to be introduced to impeach the witness Penninger. This matter is so fully shown in the opinion as to need no additional statement.

*Martin & George* and *W. J. Oxford*, for appellant, filed an able and interesting brief.

*Mann Trice*, Assistant Attorney-General, for the State.

[No brief found with the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and given ten years in the penitentiary, and prosecutes this appeal. We do not believe the court erred in overruling the motion for a continuance on account of the absence of the witness Young. Nor did the court err, as stated in appellant's second bill of exceptions, in admitting the testimony of several witnesses to the effect that the de-

fendant had previously owned the saloon in which the deceased (William Kay) was then doing business, and permitting his minor son to stay in said saloon. The theory of the defense as presented in the testimony of several witnesses was to the effect that defendant, on the Sunday evening on which the homicide occurred, had gone down to the deceased's saloon for the purpose merely to get his son, Charley, away from the saloon, or that vicinity. It appears that his son was a minor, and defendant was opposed to his son being in the saloon, and his only intention in going there was to get him away from the saloon. In contravention of this theory, the State proved that some little time before the homicide the defendant, who had pursued his son to a butcher shop, adjoining said saloon, walked up and down the street in front of said saloon and butcher shop, using abusive language towards certain persons, whom he accused of robbing him, and now having his son in said saloon, ruining him. The State was permitted to show the fact that the defendant had previously owned that same saloon, and had his son in there with him frequently, assisting in attending to the saloon business. The explanation of the court to this bill is as follows: "None of the testimony referred to in the bill of exceptions was offered by the State or admitted as original testimony against the defendant, but it was the contention of the defendant on the trial that his conduct at the time of the killing was influenced by the treatment by the deceased of his son, Charley, in keeping him in the saloon against the defendant's consent, and thereby ruining him. And testimony to this effect, on cross-examination of the State's witnesses, and by direct examination of the defendant's witnesses, was drawn out by the defendant to sustain this theory. The State, in rebuttal, was allowed to ask these witnesses, and prove by them, that prior to the time the defendant first claimed that the deceased had robbed him in business, and which fact the State claimed was the real cause out of which the killing grew, that the defendant had run this saloon himself, and that his son was permitted to frequent said saloon for years, and that they had never heard the defendant object to his son staying around the saloon until after the time the defendant claimed that the deceased had robbed him; and this testimony was admitted as a circumstance for the jury to consider in connection with the defendant's contention as above stated, and the evidence he introduced in support thereof. The testimony of each witness as the same appears in the record is here referred to and made a part of this bill of exceptions, in explanation and aid of the same, and with this explanation and qualification this bill is approved." As thus explained by the court, we think the testimony was admissible.

On the trial the State was permitted to introduce the following testimony as shown by bill of exceptions No. 3: "The State asked the witness, Penninger, who was a witness for the defendant in this cause, on his cross-examination, the following questions: '(1) Q. Did you not see W. H. Frey in the town of Stephenville on the day that defendant

killed Kay, and at or near the northwest corner of the square, and about one hour after the killing? Ans. I did not see Frey on that day, as I remember of. (2) Q. And did you not have a conversation with him, and tell him all about the killing, and all you knew about it, and did you not talk to him about one hour concerning the difficulty? Ans. I had no such conversation, that I remember of. (3) Q. Did you not tell Frey in that conversation that you had been with the defendant all day, and that you knew it [meaning the difficulty] was going to come off, and that you knew there was going to be trouble, and that you left, to keep from seeing it? Ans. I had no such conversation with Frey. (4) Q. And did you not tell Frey that when it occurred you had started home, and was between the Crow Opera House and Mrs. Sarah Harrison's hotel, and near the latter place? Ans. I did not. (5) Q. And is it not a fact that in relating the difficulty to Frey you failed to state anything at all about giving Kay a knife, and about hearing Kay say he was going out there, and call the defendant a white-hearted son-of-a-bitch? Ans. I did not state that, or anything else, to Frey, that I remember of.' And the State afterwards, in rebuttal, placed the witness, W. H. Frey, upon the witness stand, and proved by him that he did see and talk with Penninger at the time and place inquired about of Penninger, and that he talked to him about one hour; that he related to him all the circumstances of the difficulty; that Penninger said to him (Frey) that he had been with the defendant that evening, and that he knew the thing [meaning the difficulty] was going to come off, and that there was going to be trouble, and that he left, to keep from seeing it, and that he was up near Mrs. Sarah Harrison's hotel at the time it occurred. And the witness, Frey, further stated that in all of his conversation with Penninger, Penninger said nothing about having given the deceased a knife at the back end of the saloon just before the killing, and said nothing about the deceased having said that he (deceased) was going out there, and call the defendant a white-hearted son-of-a-bitch. To which questions asked the witness, Penninger, and their answers thereto, were objected to by the defendant at the time they were asked and answered, and to which testimony offered and given in evidence by the witness, Frey, to impeach the witness, Penninger, was objected to by the defendant at the time it was offered, upon the following grounds, to-wit: Because each of said questions asked and answered by the witness, Penninger, and answered by the witness, Frey, in such a way as to contradict him were immaterial, irrelevant and collateral; were calculated to injure the rights of defendant, and were attempts to elicit from the witness, Penninger, his conclusion and opinion as to whether or not the difficulty was going to come off, and such conclusion was collateral and irrelevant; and the State having asked the witness, Penninger, about all the matters testified to by Frey, and Penninger having denied such statements, they being collateral matters, and only the opinion of the witness, Penninger, the State was bound by his answer, and the State could not impeach him by showing by Frey that he had made

false statements about such matters of opinion, or about any statement that is immaterial and collateral. And the court overruled all of said objections, and admitted said testimony, to which ruling the defendant excepted." The same character of testimony is also presented in two other bills of exception. Said bills show that the witness, Penninger, was impeached by witnesses, Williamson and Dunn, upon the same point. As to a part of this testimony, appellant contends that it was an impeachment of the witness, Penninger, upon an opinion or conclusion of said witness that in his opinion (he having been with Wilson in the morning) the difficulty was going to come off. The question upon this point was as follows: "Did you not tell Frey in that conversation that you had been with defendant all day, and that you knew it [meaning the difficulty] was going to come off, and that you knew there was going to be trouble, and that you left to keep from seeing it?" to which he answered, "I had no such conversation with Frey." Subsequently Frey was placed on the stand, and the State was permitted to prove by him "that he did see and talk to Penninger at the time and place inquired about, and that he talked to him about one hour; that he related to him all of the circumstances of the difficulty; that Penninger said to him (Frey) that he had been with the defendant that evening, and that he knew the thing [meaning the difficulty] was going to come off, and that there was going to be trouble, and that he left, to keep from seeing it," etc. Now, it would have been perfectly legitimate, if the fact existed, after having laid the proper predicate by Penninger, to have proved by the witness, Frey, that the witness, Penninger, had told him, after the difficulty, that he was with Wilson, the defendant, on the day of the homicide, and prior thereto; and that he had talked with said Wilson, and that he told him that he intended to have a difficulty with the deceased, or that a difficulty was going to come off between deceased and defendant that evening. But it will be noted that the testimony of the witness is not as to any fact admissible in evidence, but the predicate laid, as well as the impeaching evidence of the witness, Frey, relates to his (Frey's) opinion that he knew the difficulty between the parties was going to come off that evening. If he knew this in such manner as it could be introduced in evidence, it was by virtue of some fact or declaration stated by the parties; and, if such fact existed, it was entirely competent for him to have given this fact to the jury, so that they might draw their conclusion or inference as to whether or not the evidence was of a character to inculpate the defendant in bringing on the difficulty. In Drake v. State, 29 Tex. Crim. App., 265 (opinion by Judge Willson), the question was of a similar character as that presented here. In that case the State was permitted, over appellant's objection, to lay a predicate by young Drake (defendant's son) to the effect that he had not stated to others that he knew on the morning of and prior to the homicide that the defendant was going to kill the deceased. On his denial of this, the State was permitted to show by four witnesses that said Drake had made this statement to them; and the court in said case lim-

ited the effect of this testimony simply to the impeachment of the witness, Drake. The reasoning of the learned judge in that case is conclusive of the very question involved in this case, and we can add nothing thereto. In said case, as in this case, the object of the testimony was to impeach; and in this case, as in that, the court limited the testimony to that purpose alone. Now, to impeach a witness is to show that he has stated a falsehood; and where it is shown in any case that a witness has stated what is not true, it is calculated to, and the very purpose of it is to go to his credit with the jury. While the testimony introduced might be immaterial as an inculpatory fact (which can scarcely be so considered in this case, as the suggestion is that from some act or thing done by the defendant, Wilson, the witness, Penninger, knew that he was going to bring on the difficulty that evening with the deceased), yet the rule is that as to matters irrelevant and immaterial the party cross-examining a witness must rest upon the answer of such witness, and will not be permitted to contradict him by other testimony; the rule being that, when a witness is cross-examined on a matter collateral to the issue, his answer cannot be subsequently contradicted by the party putting the question. The effect of this testimony (and the court so instructed the jury) was to discredit and impeach the witness, Penninger. If this witness was an unimportant witness, if his testimony for the defendant was not of a material character, it might be said that his impeachment could not operate to the injury of the appellant. But by reference to the record his evidence was the most important offered on behalf of the defendant. By said witness defendant proved that just prior to the difficulty "he went into the saloon of the deceased, through the back door, following the deceased in; that the deceased procured from him his knife, and said that he intended to go out there, and call that fellow a white-livered son-of-a-bitch." During this time defendant was walking up and down in front of the saloon, and in a short time deceased went out there, and the difficulty began. Of the number of witnesses who saw the difficulty none saw the deceased use a knife during the progress of the difficulty, but, besides the knife alleged to have been used by the defendant, another knife was found on the ground near where the homicide was committed, and this knife was identified by Penninger as his knife. So, in our opinion, the effect of the impeachment of the witness, Penninger, was to the material prejudice of the appellant. It is insisted the court erred in excluding the testimony of the witness, Siler, to the effect that he was informed by Oldham (who was a witness in the case) that a short time previous he had heard the defendant's son Charley say to some other boys "that they would wait until some dark night, when there was no moon, and waylay the old man, and do him up." Appellant offered to show by Siler that he communicated this to the appellant a short time before the homicide. The circumstances attending the difficulty show that the difficulty was not brought about in any such way. We do not believe this testimony was admissible. For the error of the court in allowing the testi-

mony of the State's witnesses to impeach the defendant's witness, Penninger, as hereinbefore discussed, the judgment is reversed and the cause remanded.

*Reversed and Remanded.*