## W. W. WILLIS v. STATE.

No. A-2329.    Opinion Filed September 11, 1917.

(167 Pac. 333.)

1.   **WITNESSES—Impeachment—Collateral Fact.** When a witness is cross-examined on a matter collateral to the issue, his answer is conclusive and cannot be subsequently contradicted by way of impeachment by the party putting the question. The test of whether a fact inquired of in cross-examination is collateral is this: Would the cross-examining party be entitled to prove it as a part of his case tending to establish his plea?

2.   **SAME—Appeal and Error.** The state was permitted on cross-examination to ask Walter Clifford, the defendant's witness, if he did not state at a certain place and time in the presence of one John Williams that, "Green is just as good as a dead man; I know that fellow Willis, and he will kill him." The witness having denied making the statement, John Williams was intro-

duced over the defendant's objection and testified that the witness Walter Clifford did make said statement. **Held,** that the admission of such impeaching evidence over the defendant's objection was prejudicially erroneous. The matter involved in the cross-examination of the witness and about which he was contradicted was not matter admissible as criminative evidence; it tended only to prove the opinion or conclusion of the impugned witness, and was a matter collateral and irrelevant to the issue being tried.

*Appeal from District Court, Pawnee County;*
*L. M. Poe, Judge.*

W. W. Willis was convicted of manslaughter, and he appeals. Reversed and remanded for a new trial.

This is an appeal from an action instituted in the district court of Pawnee county, State of Oklahoma, wherein W. W. Willis was convicted of the crime of manslaughter and sentenced to imprisonment in the state penitentiary for a period of 15 years. The evidence discloses that H. E. Green, the deceased, was a man between 45 and 50 years of age, who weighed about 200 pounds, and who came to Oklahoma about the time of the opening of the strip and purchased a homestead, the land whereupon he met his death on the 23d day of August, 1913. The deceased had had considerable trouble with his neighbors. He had previously been adjudged insane and sent to the asylum at Ft. Supply, Okla., and there remained for several years. His general reputation in the vicinity wherein he resided as to being quarrelsome, dangerous. and violent was bad. The defendant in the case became acquainted with Green prior to his being sent to the asylum. At that time the defendant and his family, which consisted of his wife and some five or six small children by his second wife, together with a couple of boys by a former marriage, resided on Green's place in a small log cabin and

picked cotton. The parties got along very well, and no trouble was encountered. The defendant had lived in that vicinity since that time, some seven or eight years prior to the death of Green. The defendant was about 54 years of age, and his physical condition, according to the testimony of an attending physician, was "below par." The defendant was a man without means, and he and his family farmed with different people in that vicinity, the landlord furnishing the horses and the implements and sharing the crop. During the fall or winter of 1912, the deceased Green came to the defendant, who was living close to the Green farm, and desired to rent him his place, to furnish the horses and to make provisions for the defendant to care for certain stock to be left on the place by Green. Green said that he expected to leave, and was looking either for a position at Ft. Supply at the asylum or at an insane asylum in Kansas.

The defendant rented the place where Green lived. The house, together with the other improvements, consisting of barns and outbuildings surrounding the same, was located almost in the center of the 160 acres of land. Green boarded with the defendant for some time in the month of December, 1912, and continued to live in the same house with defendant and his family. Green failed to obtain a position, but stayed on and lived with defendant until about the month of April, 1913, at which time defendant was called to Springfield, Mo., as a witness. Up to that time no trouble had ever occurred. While the defendant was away, he left at the place Green, and defendant's wife, and five or six small children, the oldest being a boy 12 or 13 years of age. Immediately after the defendant went to Missouri, trouble arose between Green

and the defendant's wife, a scuffle occurred, and consider-able difficulty arose over the same. The woman phoned to the officers at Pawnee, and an officer went down to the place and brought Mrs. Willis and Green to Pawnee.

Mrs. Willis conversed with the county attorney, re-lated her facts, and was advised as to Green's mental condition, going over the situation that he had been once adjudged crazy, and the woman, although not satisfied with the advice received, returned to Mannford. On the afternoon, as they returned to Mannford, the closest sta-tion to the home where these parties resided, the defend-ant, having arrived at Mannford from Missouri something like an hour or two before his wife and Green arrived from Pawnee, and being advised of the circumstances of the trouble between his wife and Green, went to the depot to meet his wife. From there they went to the hardware store of Walter Clifford, the defendant having ordered a team to take his wife and baby to their home, and Green ap-peared in front of the hardware store and called the defend-ant out. Some words were spoken and a fist fight occurred, in which the woman also engaged. Both Green and the defendant were arrested, and the defendant pleaded guilty and paid his fine, but Green pleaded not guilty. Some parties interceded for Green the next day for the reason they claimed Green had been once adjudged insane. The defendant Willis was sent for the next day and the differences settled, and it was agreed that Green should go back to the house, and there stay until a certain por-tion of work was done or the crop which he was planting could be attended to, and then he was to leave the place.

Prior to leaving the place some trouble again oc-curred between Green and the defendant's wife; Green

having undressed himself one day out in the yard before the woman and the little girl. Green left the place some time in May. The defendant came to the county attorney upon two occasions to consult him regarding the facts in the case, stating that he did not desire to have trouble, but that all he had of this world's goods was his interest in the crop. He desired only the protection of himself and family from the indignities and abuse of Green. Several letters were passed. He made two visits to the county attorney's office. He was advised of the abnormal condition of Green, and he also advised the county attorney that there had never been any trouble between Green and himself; that the trouble all arose between Green and the family. Nothing was done during this visit to the county attorney. Green was not then on the place, but the defendant anticipated that he would return at any time, and that perhaps trouble might ensue. Green returned home some time in July. After he returned, it was not long until trouble again ensued.

The defendant, although having the place leased, and supposed to have the use and occupancy of the house and the use of the team, finding that he was unable to agree or get along with Green, and Green insisting upon staying on the place, the defendant decided that he would move, and he went to Mannford and made arrangements with Walter Clifford, the owner of the hardware store, to purchase a tent and to move onto the 40 acres owned by the said Walter Clifford adjoining the Green land. On or about the 13th day of August, 1913, he moved his wife and six children from the house on Green's place and began living in a tent on Clifford's place. At the time of moving from the place to the tent, Green again had

trouble with the family, and on that occasion assaulted a little boy about 13 years of age, and had a difficulty with Mrs. Willis, while the defendant was away from the house moving the belongings to the tent. A day or two afterwards the defendant again came to the county attorney and informed him of the trouble, and informed him that he had just moved and taken his family from the house to a tent, and had moved into the tent for the purpose of avoiding trouble. After talking it over with the county attorney; he stated that as far as he was concerned he had always got along with Green, but the trouble always arose between Green and his family, and that he and Green had agreed on a division of the crop. No action was taken at that time, as it was thought further trouble might be avoided because of the separation of the parties.

The defendant and Green did not see each other, or there is no evidence that they ever met, from the day the Willises left until the day Green met his death. The evidence discloses that upon that Saturday afternoon the defendant, with his son Brooks Willis (a son of his first wife, and about 19 years of age) and Marion Clifford, an old gentleman who was staying with Willis, took a bucket, a half bushel, and a gunny sack or two and started to the Green home for the purpose of gathering some vegetables that belonged to the defendant; a sufficient amount to last them over Sunday. As they went across to the Green place, which was adjoining the place where the tent was located, the defendant, with his son Brooks and the old gentleman, Marion Clifford, started across the place through the woods and pasture to the garden. In going

o the place very close to the house they met Mr. Green, who was then plowing. They stopped and talked in a friendly way with Green. Green suggested that he had some cider at the house; that he would drive up and they could all have a drink. He drove his team to the north of the house, and they all walked across the plowed ground to a large tree located some 20 or 30 feet from the house, where there was a keg partly filled with cider. They all seated themselves around the keg, and Green poured out some apple cider, and they drank; after taking a drink they sat down and again talked about the crops and general conditions, and Green poured out some more cider, and some of them took a second drink. Willis got up and suggested they had better go and get their vegetables, as he had expected to go up and look after some corn on the Green place. Apparently no quarrel arose and nothing was said. The old man Clifford, who had lived in that vicinity for many years and knew' the mental condition of Green, a few moments before the tragedy occurred got up and started home, and when the defendant got up and started around the tree Green got up and jerked a knife out of his pocket and told him he, was going to cut his heart out. The boy, Brooks, ran around the tree. Green also ran around to the south side of the tree where the old man was standing. Brooks stepped in between Green and defendant and pushed Green back, and Green immediately knocked him out of the way, and started for the old man Willis, and was only a few feet from him. Willis told him to stop, but Green refused and kept rushing at him with a knife in his hands; the defendant pulled the gun and shot. Four shots were fired, and Green fell immediately south of the tree. The defendant and his son

got up, and after talking a little, the defendant suggested to the boy that he go to a neighbor's and phone for the doctor and the sheriff, and the defendant started home. This the boy did not do, but followed his father home.

After the defendant arrived home he went to a neighbor's himself and told him the conditions and trouble, told what he had done, and asked the neighbor to phone for the doctor and for the sheriff. This was done. The neighbors took care of Green. The defendant met the deputy sheriff of Creek county, went with him to Mannford, and came on the next day to Pawnee, and was placed in jail.

The foregoing account of the facts and circumstances is necessarily taken from the statement of the defendant and his witnesses. There was no eyewitness to this tragedy favorable to the state. After mistrial the case was again set for trial, and in February, 1914, the jury returned a verdict finding Willis guilty of manslaughter in the first degree, and fixing his punishment at 15 years in the state penitentiary.

*McNeill & McNeill,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). It is contended that the court erred in permitting the state to impeach the witness Walter Clifford on a collateral and irrelevant matter over the objection and exception of plaintiff in error and to his substantial prejudice. The record on this question shows the following:

"Q. Do you know John Williams? A. Yes, sir. Q. Do you remember the circumstances of saying to John

Williams after Ed Russell walked away with these two men that Green is just as good as a dead man; I know that fellow Willis, and he will kill him? A. Did I say that to John Williams? Q. Did you say that to John Williams? A. John Williams? · Q. John Williams. A. No, for I don't talk to John Williams at all."

Over the objection and exception of the defendant, the witness John Williams was permitted to give the following testimony:

"Q. Mr. Williams, I will ask you if near the entrance of the Mannford Hardware Store on the occasion of the row between Mr. Green and Mr. Willis, if Mr. Walter Clifford made the statement in your presence that Green is just as good as a dead man? A. Yes, sir. Q. (Continuing) 'I know that fellow Willis, and he will kill him.' "

"Mr. McNeill: We object to that question as incompetent, irrelevant, and immaterial, not made in the presence of this defendant and not binding upon the defendant, not proper rebuttal testimony.

"The Court: Overruled.

"Mr. McNeill: Exception.

"Q. Did he make that statement? A. Yes, sir."

The court instructed the jury as follows:

"The court permitted the witness John F. Williams to testify in this case relative to a certain conversation had with Walter Clifford as follows: 'Q. Mr. Williams, I will ask you if near the entrance of the Mannford Hardware Store on the occasion of the row between Mr. Green and Mr. Willis, if Mr. Walter Clifford made the statement in your presence that Green is just as good as a dead man; "I know that fellow Willis, and he will kill him." Did he make that statement? A. Yes, sir.' The court therefore charges you that the purpose of this question and answer was for the exclusive purpose of impeachment,

and it is not to be considered by you for any other purpose in arriving at a verdict in this case, nor must you suffer or permit the same to prejudice you in the slightest degree or consider the same in connection with ascertaining the guilt or innocence of the defendant. If, however, you believe that said statement was made, then the same may be considered by you in testing the credibility of the evidence given by the said Walter Clifford, and must not be considered for any other purpose whatsoever in this case."

In the case of *Payne v. State,* 10 Okla. Cr. 314, 136 Pac. 201, it was held:

"When a witness is cross-examined on a matter collateral to the issue, his answer is conclusive and cannot be subsequently contradicted by way of impeachment by the party putting the question."

It is thoroughly established in all jurisdictions that if a witness is permitted to answer an impeaching question on a collateral matter the party asking the question is bound by the answer given. So in this instance there can be no question that the matter inquired into of the witness Clifford was purely collateral. The state, therefore, was bound by his answer, and it was error for the trial court to permit him to be impeached upon that issue. Not only was it error to permit the witness Clifford to be impeached upon this issue, but the fact that the trial court instructed the jury that it was an issue upon which the witness could be impeached was also erroneous. In the case of *Drake v. State,* 29 Tex. App. 265, 15 S. W. 725, the Supreme Court of Texas, in passing upon a question almost identical with this, said:

"James Drake, Jr., a witness who testified in behalf of the defendant, was asked upon cross-examination the

following question: 'On the evening or night of August 27, 1887, the day Guinn was shot by your father, at or near the store of Charles Rast, on Austin street in the city of Waco, Tex., and in the presence of Hugo Robinson, Street Bacon, Bob Fleming, and Todd Zeigler, did you not say that you knew your father was going to kill Guinn before you left your father's house that morning?' The witness answered that he had not made any such statement. Thereafter the state proved by Hugo Robinson, Street Bacon, Bob Fleming, and Todd Zeigler that the witness James Drake, Jr., did make the statement set forth in the question, in their presence, at the place and time specified in said question. Defendant objected to the question, and objected to the test'mony of the witnesses Robinson, Bacon, Fleming, and Zeigler. His objections to the question, briefly stated, were that if the witness Drake had made such statement it was a mere opinion, was not adm'ssible against the defendant, was criminative evidence, and that the question was not permissible for the purpose of laying a predicate to impeach the witness Drake because it related to a matter collateral to the main issue, and called for a statement which, if made, was a mere opinion of the witness. The objection made to the impeaching testimony was that it related to a matter collateral to the main issue; a matter of opinion, and not of fact. It cannot be questioned that the statement which the witnesses Robinson, Bacon, Fleming, and Zeigler testified was made by the witness Drake was inadmissible as crim'native evidence against the defendant. It was not introduced or admitted as criminative evidence, but for the sole purpose of impeaching the credibility of the witness Drake, Jr., and the jury was plainly and emphatically instructed in the charge of the court as to the purpose for which said testimony was admitted, and that it could not be considered for any other purpose. *Drake v. State,* 25 Tex. App. 293, 7 S. W. 868. Was it competent to impeach the witness Drake, Jr., in the manner permitted? This same testimony was before this court on the

former appeal, but it does not appear from the report of the case that it was objected to on the trial. We presume that the objections now presented to it were not presented on the former appeal, as we find no reference in the opinion to any objection. Our former opinion, therefore, does not answer the question above propounded, and we are now called upon to consider and answer it. 'When a witness is cross-examined on a matter collateral to the issue his answer cannot be subsequently contradicted by the party putting the question.' Nor is it proper to allow a witness to be cross-examined as to any matter which is collateral and irrelevant to the issue merely for the purpose of contradicting him by other evidence. Whart. Crim. Ev. (9th Ed.), sec. 484; *Rainey v. State,* 20 Tex. App. 473; *Hart v. State,* 15 Tex. App. 202 [49 Am. Rep. 188]; *Johnson v. State,* 22 Tex. App. 206, 2 S. W. 609; *Brite v. State,* 10 Tex. App. 368; *Stevens v. State,* 7 Tex. App. 39. What is collateral and irrelevant matter within the rules above stated? In his work on Criminal Evidence (9th Ed., sec. 484) Mr. Wharton, quoting from the opinion in *Hildeburn v. Curran,* 65 Pa. 63, says: 'The test of whether a fact inquired of in cross-examinations is collateral is this: Would the cross-examining party be entitled to prove it as a part of this case tending to establish his plea? This test has been quoted and adopted by this court in *Hart v. State,* 15 Tex. App. 202 [49 Am. Rep. 188], and in *Johnson v. State,* 22 Tex. App. 206, 2 S. W. 609. Having this plain and approved test, it only remains for us to apply it correctly to the impeachment of the witness Drake, Jr., as permitted in this case, and thereby ascertain whether or not that impeachment was legal.

"What was the fact inquired about? A statement made by the witness Drake, Jr., that he knew that his father (the defendant) was going to kill Guinn (the deceased) before he (the witness) left home that morning— the morning of the day of the homicide. Would the state have been entitled to prove as a part of its case by the

witness Drake, Jr., or by other evidence, that said witness knew on the morning of and prior to the homicide that his father intended to kill the deceased? Could such knowledge of the witness be considered a fact, and a relevant, material fact? Suppose the witness Drake, Jr., while upon the stand had been asked by either party the question: 'What was defendant's intention towards the deceased before you left home on the morning of and prior to the homicide? Would such a question, if objected to upon the ground that it called for the opinion or conclusion of the witness, and not for facts, have been allowed by the court? We do not think the question would have been legitimate and permissible. How could the witness know as a fact of the intention of the defendant? That a certain intent existed is a conclusion deduced from facts; from the words and conduct of the individual to whom the intent is imputed. It is for the jury, and not  *  *  *  the witness, to deduce the conclusion, and that they may do this the witness must state the facts from which the conclusion as to the intent is sought to be deduced. Upon the facts the conclusion deduced by a jury as to intent might be the very opposite of that reached by the witness. Suppose counsel for the state on cross-examination had asked the witness Drake, Jr., the question, 'Did you know on the morning of and prior to the homicide that the defendant was going to kill the deceased?' would the question have been legitimate? We think it would not have been. It was calculated to elicit from the witness his conclusion merely, his conclusion as to the intention of the defendant. How could the witness know that defendant was going to kill the deceased? He could not know it. He could merely conclude that it was the defendant's intention to do the act, and this conclusion he would deduce from facts within his knowledge. An affirmative answer to the question would not be evidence of a fact, but merely the opinion of the witness as to the intention of the defendant. Knowl-

edge of what the defendant was going to do could be nothing more than the witness' opinion or conclusion deduced from the words and acts of the defendant. Such knowledge is not a fact. If the question had been, 'Did the defendant on the morning of and prior to the homicide tell you that he was going to kill the deceased?' it would have been legitimate. It would have been an inquiry for a fact; a fact relevant and material to the main issue; a fact which the state would have been entitled to prove as a part of its case. If in laying the predicate to impeach the witness Drake, Jr., he had been asked, 'Did you not state in the presence of Hugo Robinson, Street Bacon, Bob Fleming, and Todd Zeigler, on the evening or night of August 27, 1887, the day that Guinn was shot by your father, and at or near the store of Chas. Rast, in Waco, that your father told you on that morning before the homicide that he was going to kill Guinn?' the question would have been proper, would have been as to a fact relevant and material to the main issue; a fact with respect to which the witness could be impeached by proving that he did make such statement. And so of any other fact of like character. As we have before stated, we regard the matter about which the witness Drake, Jr., was contradicted as a matter of opinion merely, a conclusion of the witness, and not a fact. Opinions of witnesses, as a general rule, are not admissible in evidence. Witnesses must be confined to a statement of the facts within their knowledge, from which facts the jury are to deduce their own conclusion. Wilson Crim. St., sec. 2502. There are well-established exceptions to this general rule. One of these execeptions is where the facts from which the opinion proceeds as an effect are of a character that they cannot be so detailed and presented to the minds of a jury as to impart to them the knowledge which the witness actually possesses. Whenever a condition of things is such that it cannot be reproduced and made palpable in the concrete to the jury, or when lan-

guage is not adequate to such realization, then the wit‚ ness may describe it by its effect upon his mind, even though such effect be opinion. *Powers v. State,* 23 Tex. App. 42, 5 S. W. 153. But the opinion or conclusion of the witness Drake, Jr., as to the intention and purpose of the defendant to kill the deceased, cannot be brought within this or any other exception to the general rule."

See, also, *Wilson v. State,* 37 Tex. Cr. R. 64, 38 S. W. 610; *Morton .v. State,* 43 Tex. Cr. R. 533, 67 S. W. 115; *State v. Dunn,* 53 Or. 304, 99 Pac. 278, 100 Pac. 258; *Parker v. State,* 46 Tex. Cr. R. 461, 80 S. W. 1008, 108 Am. St. Rep. 1021, 3 Ann. Cas. 893; *Justice v. Commonwealth* (Ky.) 46 S. W. 499.

Was the admission of this testimony injurious? Clearly so. The witness Walter Clifford was one of the main witnesses for the defendant in this case. He had known the defendant for a number of years, even prior to the time when he moved to that community. The fact that Clifford was intimately acquainted with the defendant, had known him for so long a time, would necessarily impress the jury with the fact, if it were true, that Clifford believed old man Willis to be a dangerous and desperate man, although he had testified in his favor, and as to his general good reputation for peace and quietude in that community. Also, in view of the fact that the court instructed the jury that the witness Clifford might be impeached by testimony of this kind, the jury would naturally conclude that having been impeached by such testimony he could not be believed in any statement that he had made. The instruction, therefore, was very prejudicial. The impeachment of the witness should not have been permitted. In view of the fact that this is a close

case, in which the testimony for the defendant clearly makes out a case of self-defense, and in which a former jury was unable to agree, this court is impressed with the fact that this testimony must have had considerable influence upon the jury in reaching a verdict of guilty. We believe it is our plain duty, therefore, to reverse this judgment of conviction upon this ground alone.

Other errors are complained of, but they are either lacking in merit or are such as are not likely to arise upon a retrial of the case. We deem it unnecessary, therefore, in view of the conclusion that we have herein reached, to pass upon them.

The judgment is reversed, and the cause remanded for a new trial.

DOYLE, P. J., and ARMSTRONG, J., concur.