Howard GADDIS, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12871.

Court of Criminal Appeals of Oklahoma.

Dec. 28, 1960.

Rehearing Denied Feb. 1, 1961.

Second Petition of Rehearing Denied April 5, 1961.

523

Valdhe F. Pitman, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Howard Gaddis, plaintiff in error, hereinafter referred to as defendant, was charged by information in the district court of Oklahoma County with the crime of burglary in the first degree, was tried before a jury, convicted and his punishment fixed at seven years confinement in the State Penitentiary at McAlester, that being the minimum punishment for the crime charged. 21 O.S.1951 § 1436.

Appeal has been perfected to this Court.

But one proposition is presented, and being that the court erred in admitting the testimony of the rebuttal witnesses, June May and Al Roberts.

To properly understand the issue presented, it will be necessary to summarize the pertinent evidence of the State in making out its case, and the evidence of the defendant's witnesses germane thereto.

Carol Ruth Tillotson, the complaining witness, stated that since November 14, 1958 she had married, and her name at time of the trial was Carol Ruth Ewing. That on November 14, 1958 she was a medical student at the University of Oklahoma Medical Center. She was in her third year. She lived in an apartment at 1313½ North Phillips, Oklahoma City, near the school. The elevation made the apartment look like a garage apartment. At about 8:15 p. m. on November 14, 1958, she said the defendant, a young negro boy, whom she positively identified, came to her screen door and asked for "June May". Witness informed him there was no one there by that name, and he then started down the steps and witness remembered that June May had previously lived at this address, and she informed the defendant that June May had moved. Defendant left, but about 15 minutes later returned and wanted to use the telephone. He persisted even after witness refused to admit him, and finally jerked the door open, came in and hit

witness twice with his fist, knocked her down and then dashed over to the desk, got her purse and ran out. Witness was in a dazed condition, her jaw was broken, two teeth cracked, and she was in much pain. She said that defendant may have hit her more than two times. Her injuries required surgery, and she was in the hospital four days. She was compelled by reason of her injuries and loss of time from classes that followed, to withdraw from school, and she returned to her home in Colorado.

Witness testified that her bag that defendant took from her desk contained a comb, lipstick and a purse that had in it a one-hundred dollar personal check, and some small change, and her driver's license. She said that neither the purse nor the contents were ever recovered.

Witness summoned a boy next door, who came and took her to the hospital and the police were notified. Later on, in December, 1958, she went to two police line-ups, but did not see the defendant. She looked at pictures shown her by officers, but never saw a picture of the defendant. She returned to her home in Colorado.

Thereafter, in January, 1959, defendant had been charged with the crime by reason of a confession shown by other evidence to have been made to an Oklahoma City officer who previously knew nothing of the case. There were a number of persons charged with crime in the court room when she returned to Oklahoma for the preliminary hearing. She pointed out and positively identified the defendant as the burglar and her assailant. After gruelling cross-examination witness did not deviate from her account of what happened.

J. W. Anthony, officer with the Oklahoma City Police Department, next testified for the State. He said that he was so employed on November 14, 1958. He and his partner, officer Bob Perdue, had occasion to talk to the defendant Gaddis on the evening of December 24, 1958 on the second floor of the police station, in the interrogation room. Witness said at the time he had never heard of the burglary case for which defendant was then being tried; and on cross-examination he said that he had never before that time talked with Miss Carol Ruth Tillotson. The officers were investigating defendant about another matter. Said witness:

"I had an occasion to talk with the defendant twice. The first time that I talked to him was in the interrogation room of the Chief of Detectives; he told me that on or about November 14, that he had broken into a lady's apartment. He described the building as an apartment above a business, and that he had to go up some wooden stairs. And when he got to the door, that the door was open, but the screen was locked. He asked the lady inside for June May. And the lady told him that June May no longer lived there. And then she turned her back, and when she did this, he pulled the screen loose. He entered the apartment of the young lady and knocked the lady to the floor and after doing that, he kicked her. I had no knowledge of this case at that time, so we put the boy in jail and in his cell. I went through the reports and I did find an incident of this type.

"Q. Then what happened? A. To make doubly sure, I went back up to the cell and talked to the boy in the cell again. And at the time of this conversation, there were two or three prisoners there. I wanted to know what he had done with the lady's purse. We had not mentioned that in my first conversation. He told me there in the cell that he had thrown this purse into some bushes. And he said he didn't believe he could find it that night, but if the officers would take him in the daylight, that he would be able to find the lady's purse. After that I made my report and that was as far as I went on this case.

"Q. You stated that you checked your report at this time, now was that the only thing that he didn't tell you

about? A. That's true, because I didn't know anything about the purse, until I read it in the report."

D. C. Mosshart, Jr., testified that he had been with the Oklahoma City Police Department for eight years; that on December 26, 1958 he was assigned to make a follow-up investigation of the defendant Gaddis; that at the time he had never talked with the witness Carol Ruth Tillotson. He said that he and his partner, J. R. Donnell, talked with the defendant twice; once in the interrogation room on the second floor, police department, and also in the office of the chief of detectives. He said that defendant started out to give them a signed statement, but that defendant's father was present during the interrogation and got emotional, and when defendant would start to talk, his father would say, "tell the truth, don't hang you head. Look me in the eye", and then the defendant would become emotional. He said that defendant was around 16 years of age at the time, and that all statements were voluntary. Said he:

"While we were in the interrogation room and questioning him, about the incident, he did admit the incident, and admitted forcing the front door and forcing the latch, and admitted entering the room and striking the complaining witness with one hand and striking her with his other hand. When she fell down, he kicked her, but he didn't know how many times; then, he grabbed her purse off the table there in the same room and ran out the door with it."

L. K. Filson, policeman, testified, but such testimony is not pertinent to the issue raised.

The defendant produced twelve witnesses in an attempt to prove an alibi. He attempted to show by these witnesses that they saw him at the Stockyards Coliseum, Oklahoma City, witnessing the wrestling matches on November 14, 1958, commencing at 8:00 p. m., and continuing until around 11:00 p. m.

The first witness was H. C. Green, 724 Southeast 39th Street, owner-operator of a furniture van. He said that he had known the Gaddis family 21 years, the defendant all of his life; that defendant's father was owner of a garage and did all of witness's mechanical work. He said that he was a wrestling fan, as was the Gaddis family, and that he attended the wrestling matches each Friday night regularly if he were in town, and had done so for about eleven years. That the Gaddis family were all wrestling fans, and attended in a group. He said that he remembered attending the wrestling matches on November 14, 1958; that he got there around 7 p. m., that he went early to get his favorite seat. He said that defendant's father, Buddy Gaddis, had agreed to meet him there at 7:30 p. m., but did not arrive until five minutes before 8:00 o'clock. That Gaddis brought a number of his children with him, including the defendant Howard Gaddis.

Witness said that he fixed the date November 14, 1958 as that was the time there was wrestling between "the two main guys that we all want to see so bad, was The Great Bollo and *Antonio Ripper*". He said there were some midgets that wrestled. Witness said, "That was a special match between him and *Ripper Antonio,* and both are what we call 'news' on the match card. We would like to see them kill one another, if they could". He said that he was not at the wrestling match the Friday before, or the Friday after November 14, 1958, because he was out of town with his van.

The other witnesses for defendant remembered seeing him at the wrestling matches on November 14, 1958 because they said that was the time the Great Bolo wrestled Tony Marelli. None of them mentioned Ripper Antonio being on the card on November 14, 1958.

The defendant Howard Gaddis testified and said that he was 17 years of age at time of trial, and lived with his father and mother at 610 North Missouri, in Oklahoma

City; that he had six brothers and seven sisters. He said that on November 14, 1958 he had a job with the Cain Coffee Company on 12th and Santa Fe; that he went to work at 12:00 noon and worked until 7:00 p. m., that his mother picked him up and took him to his father's garage at 908 North Kate, stayed there a minute or two and accompanied his family home. He said that soon the whole family got in their car and went to the wrestling matches. He said that his father, mother, brothers and sisters and one Abram Ross went together. He said they arrived at the Coliseum at about five minutes before 8:00 o'clock. He said there was a special event on that night. Said he: "Well, Bolo and Tony Marelli had never been beaten and one of them was supposed to leave town, whoever would lose the bout, they were supposed to leave town." He said that that was the first time he had seen Bolo and Marelli wrestle each other and that Bolo won and Marelli had to leave town. He said that the only reason he remembered the date, November 14, 1958, was because Bolo the Great and Tony Marelli were matched against each other. He said that some midgets also wrestled, Chief Little Beaver and "Cowboy somebody". He also saw the midgets wrestle a week or so after November 14, 1958.

Defendant denied that he saw the prosecuting witness, Carol Ruth Tillotson, on the evening of November 14, 1958 or at any other time until arraignment. He denied that he ever hit her or entered her apartment. He also denied that he had ever known a white female by the name of June May.

Witness was asked if he had ever admitted to anyone that he had committed the crime charged, and answered: "I don't think I did. If I did, I was scared and didn't know what I was doing."

Witness also said that he had not seen his witness H. C. Green from the time he was put in jail until the time he got out on bond.

The State used a number of witnesses in rebuttal, one being an official with the Oklahoma Weather Bureau, to attempt to contradict some of the defense witnesses' statements as to the state of the weather on November 14, 1958, during the wrestling matches.

Jack Hull testified and stated that he and his brother were wrestling promotors at the Stockyards Coliseum, Oklahoma City. He stated that he promoted the matches held November 14, 1958. He had a book containing a record of the matches covering a long period of time prior to and after November 14, 1958. He said the main event was between the Great Bolo and Kurt Von Broner, on November 14, 1958, and there was a special tag team event between four midgets. He said that the main match was won by Von Broner on a disqualification against the Great Bolo. He denied that Tony Marelli was on the card on November 14, 1958, or that a midget by the name of Little Chief Beaver wrestled at that particular time. He said that Bolo also appeared on October 10, 17, 24 and 31, and November 7, 14, 21 and 28. The midgets did not wrestle in September, October or November except November 14, but he did have midget wrestlers in 1959.

Witness said that Tony Marelli was on the card on September 5, 12, and 19, but was not thereafter on the card on through December. That on September 19 the main event was between the Great Bolo and Tony Marelli, and that Bolo won.

Now we come to the rebuttal testimony objected to.

Al Roberts, head jailer of Oklahoma County, testified and was permitted from his records to give the names of persons visiting the defendant Gaddis in the county jail on March 3, 1959, among whom was H. C. Green, 724 Southeast 39th Street. Defendant had denied on cross-examination that his witness Green had ever visited him while he was in jail. Defense counsel objected to this rebuttal testimony on the ground that anyone could sign the name of H. C. Green on the register.

June May testified that she then lived at 740 N. E. 13th Street, and was a third-year medical student. She said that on October 13, 1958 she had moved from the apartment at 1313½ North Phillips to her then address; that at about 8:20 the evening of October 13, 1958 she heard a noise at her door which was open but the screen latched; that she looked out on the landing and a colored boy was at her door and wanted in to use her telephone, and when she refused he knocked her off her porch and took her purse; that the purse contained a case for her glasses with her name on it. She pointed out the defendant as looking very familiar and like the boy who hit her and took her purse, but she would not say positively.

Defense counsel objected to this testimony and moved that all of it be stricken, as being incompetent, irrelevant and immaterial, and as having no bearing on the case. The objections were overruled.

The Attorney General argues that the testimony of Al Roberts served to "show the interest and activity of the star witness, H. C. Green, as well as to impeach the the defendant." Green was never asked whether he had visited the defendant in jail, though he had testified that he had talked to defendant's father a number of times. At all events, as to the alibi, Green's testimony was different from the other witnesses in identifying the date he had seen the defendant at the wrestling matches by way of who wrestled in the main event. We have seen that the wrestling promotor denied that either Ripper Antonio, as testified to by Green, or Tony Marelli, as testified by the other witnesses for defendant, appeared on the card with the Great Bolo on the particular date in question, November 14, 1958; but that it was Kurt Von Broner who opposed him and who won on a disqualification against Bolo. Tony Marelli had appeared in the main event against the Great Bolo on September 19, 1958, and Bolo was the winner.

■ Whether Green did or did not visit the defendant while he was in jail awaiting trial was a collateral matter, and defendant's answer on cross-examination was binding on the one putting the question.

■ The test as to whether the question was collateral is: Would the cross-examining party be entitled to prove it as a part of the case tending to establish his plea?

The pertinent question was whether the defendant committed the robbery charged. His plea was an alibi. Whether or not witness Green visited or did not visit the defendant while he was in jail had no bearing on whether or not defendant at the time of the robbery charged was at the scene or miles away at a wrestling match. See Willis v. State, 13 Okl.Cr. 700, 167 P. 333, citing Drake v. State, 29 Tex.App. 265, 15 S.W. 725; Hall v. State, 51 Okl. Cr. 50, 299 P. 508; Payne v. State, 10 Okl.Cr. 314, 136 P. 201; Frey v. State, 97 Okl.Cr. 410, 265 P.2d 502.

■ In the Hall case, supra, and other cases from this Court the rule announced by Wharton on Evidence, par. 559, has been adopted. It reads:

"In order to avoid interminable multiplication of issues, it is a settled rule of practice that, when a witness is cross-examined on a matter collateral to the issue, he cannot, as to his answer, be subsequently contradicted by the party putting the question."

The next question is, was the admission of the testimony of the witness Al Roberts, the jailer, injurious?

■ From a study of the evidence, the question of whether witness Green ever visited the defendant while he was in jail could not have any bearing on the question of the alibi. But the error in this particular instance we must hold harmless. 22 O.S.1951 § 1068.

It has been noted that on direct examination defendant's own counsel had asked him: "Howard, on November 14, 1958, did

you ever have an occasion to see this young lady here? [Carol Ruth Tillotson, the prosecuting witness]" He answered in the negative. Then, later, his counsel asked him, "Howard, do you know any white female by the name of June May?" He answered "No".

Carol Ruth Tillotson, as we have seen, on direct examination had positively identified the defendant as the robber and her assailant who on November 14, 1958 at about 8:15 p. m. broke into her apartment, and just prior thereto had asked for June May.

This had been corroborated by a confession made to officer J. W. Anthony, who at the time had never heard of Miss Tillotson, Miss May, or the robbery.

■ The testimony of June May was pertinent to the statement given on direct examination by defendant that he did not know June May, the person Miss Tillotson had testified that defendant had inquired about just prior to the robbery. The circumstances recounted by June May that she had occupied the apartment at 1313½ North Phillips just prior to Miss Tillotson, and that a young negro had come to that same apartment on October 13, 1958 ostensibly to use her telephone and had knocked her off her porch and had taken her purse containing a glasses case with her name stamped on it, gave the defendant, if it was defendant, means of learning the name of June May. Miss May was frank to say that she could not positively identify the defendant, but said that he looked very familiar. But officer Anthony on direct examination had testified that the defendant in his confession to him had said that when he went to the apartment at 1313½ North Phillips and found the screen door fastened and when Miss Tillotson came to the door, he had asked for June May.

Under the circumstances recounted we do not think the court erred in admission of the rebuttal testimony of June May heretofore set out. The fact of the prior breaking in of the same apartment while a different offense, was so related, under the circumstances recounted, as to identify the defendant with the commission of the crime for which the defendant was on trial. The other offense was an incidental development in offering proof that defendant did know June May, not only by his admissions but having her name from the contents of her purse. Thus we have an exception to the general rule that in prosecution of one accused of a particular offense, evidence showing or tending to show commission by accused of other crime or crimes entirely distinct and independent of that for which he is on trial, even though they be of the same class, is neither relevant nor admissible. For a discussion of the principle, see Rhine v. State, Okl.Cr., 336 P.2d 913.

For the reasons given, the judgment is affirmed.

NIX and BRETT, JJ., concur.